**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION
OBTAINED FROM YOU MAY BE USED FOR THAT PURPOSE.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Johnson Bank, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-05865 |
| | ) | |
| Daniel E. Walsh, an individual; | ) | |
| Noelle Walsh, an individual | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR DEFAULT JUDGMENT AND PROVE-UP

NOW COMES the Plaintiff, JOHNSON BANK, by and through its attorneys, Klein, Daday,

Aretos & O'Donoghue, LLC, and moves this Court, pursuant to section 2-1301(d) of the Illinois

Code of Civil Procedure (735 ILCS 5/2-1301(d)), for entry of a default judgment against Defendants

DANIEL E. WALSH and NOELLE WALSH ("Defendants"). In support thereof, Plaintiff states as

follows:

1.      That I, Daniel J. Lee, attorney for Plaintiff in this cause do hereby certify that on

September 23, 2014, the Defendants were served by substitute service. On November 3, 2014, the

Court, after a careful review of the docket and status report, entered a default against the Defendants,

Daniel E. Walsh and Noelle Walsh. *See Exhibit A.*

2.      On February 3, 2015, the Defendants filed a Motion to Vacate Judgment and

asked for leave to file a proposed Answer. After the Motion to Vacate was fully briefed, the

Court issued an Order on September 2, 2015 denying the Motion. The Court held that service on

1

the Defendants was proper and that the Defendants have failed to present a viable defense. See Exhibit B. Therefore, the Defendants remain in default.

3.      That by virtue of the above default, the material factual allegations of the Complaint have not been denied by the Defendants, and the Complaint is therefore confessed against him.

4.      That an examination of the files, pleadings, and records reveals that Plaintiff is entitled to entry of judgment against Defendants as a matter of law.

5.      Attached hereto is an Affidavit of Amounts Due and Owing signed by Lydia Vela, Litigation Specialist in the Consumer Special Assets Department of Johnson Bank. *See* Affidavit of Amounts Due and Owing attached hereto and incorporated herein as *Exhibit C.*

WHEREFORE, Plaintiff JOHNSON BANK prays for the entry of a default judgment, pursuant to section 2-1301(d) of the Illinois Code of Civil Procedure (735 ILCS 5/2-1301(d)), in its favor and against Defendants DANIEL E. Walsh and NOELLE WALSH, and for such other relief as this Court deems just.

Respectfully submitted,
JOHNSON BANK


Daniel J. Lee
Klein, Daday, Aretos & O'Donoghue, LLC
2550 West Golf Road, Suite 250
Rolling Meadows, IL 60008
(847) 590-8700
Attorney No. 91091

## UNITED STATES DISTRICT COURT
### FOR THE Northern District of Illinois − CM/ECF LIVE, Ver 6,1
### Eastern Division

Johnson Bank

                Plaintiff,

v.

Daniel E Walsh, et al.

                Defendant.

Case No.: 1:14−cv−05865
Honorable Ruben Castillo

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Monday, November 3, 2014:

    MINUTE entry before the Honorable Ruben Castillo:After a careful review of the Plaintiff's status report [5] and the case docket, the Court hereby enters a default against defendants, Daniel E. Walsh and Noelle Walsh for failure to timely appear, answer or otherwise plead to the plaintiff's complaint. The Court will retain jurisdiction to enter any appropriate default judgment. Mailed notice(rao, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov*.



# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6,1
### Eastern Division

Johnson Bank

                    Plaintiff,

v.                                                    Case No.: 1:14–cv–05865
                                                      Honorable Ruben Castillo

Daniel E Walsh, et al.

                    Defendant.
_____

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, September 2, 2015:

      MINUTE entry before the Honorable Ruben Castillo:After careful review of the relevant pleadings, defendants' motion to vacate [17] is denied. The court concludes that service was proper in view of defendants' repeated attempts to evade service. Additionally, defendants have totally failed to present a viable defense.Mailed notice(rao, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at *www.ilnd.uscourts.gov.*



**THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION
OBTAINED FROM YOU MAY BE USED FOR THAT PURPOSE.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Johnson Bank, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14-cv-05865 |
| | ) | |
| Daniel E. Walsh, an individual; | ) | |
| Noelle Walsh, an individual | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF AMOUNTS DUE AND OWING

I, Lydia Vela, being first duly sworn on oath, depose and state that I am a Litigation Specialist in the Consumer Special Assets Department of Johnson Bank; and its duly authorized agent on its behalf, and that I have full knowledge and authority to make this Affidavit, that I have personal knowledge of the loan file of the Defendants, DANIEL E. WALSH and NOELLE WALSH ("Borrowers"), and that I have personal knowledge of the material allegations of the Complaint and personal knowledge of the business of Johnson Bank and its mode of operation. My duties as a Litigation Specialist include a review of the Borrowers' loan file and the documents contained therein, which I performed prior to making this affidavit. If called to testify at the trial of this matter, I could competently testify as to the facts contained in this affidavit.

1



1.     This Affidavit is made pursuant to sections 2-1301(d) and 2-1005(c) of the Illinois Code of Civil Procedure, 735 ILCS 5/2-1301(d); 735 ILCS 5/2-1005(c).

2.     On or about March 6, 2008, Defendants Daniel E Walsh and Noelle V. Walsh ("Defendants") executed a Home Equity Line of Credit Agreement and Disclosure payable to Johnson Bank in the principal amount of $385,000.00, with interest (the "Note"). (See Exhibit A attached hereto and incorporated herein).

3.     On or about March 6, 2008, Defendants executed a mortgage on the property located at 1438 Pleasant Lane, Glenview, IL to secure all debts made by Johnson Bank to Defendants (the "Mortgage"). A copy of the Mortgage is attached hereto and incorporated herein as Exhibit B.

4.     On or about July 18, 2010, Defendants executed a change in terms agreement, a copy of which is attached hereto and incorporated herein as Exhibit C.

5.     Pursuant to the Note, and the Mortgage, Plaintiff advanced said sum to Defendants and Defendants were to make monthly payments to Plaintiff equal to the amount of the Defendants' accrued finance charges, with a final balloon payment due when the Note matures.

6.     Defendants have defaulted on the Note by failing to make payments when due and therefore is in breach of the agreement.

7.     Defendants failed to make the payment due on April 29, 2011 and each payment thereafter, causing Plaintiff to accelerate the Note according to its terms.

8.     By reason of said failure and Default, Plaintiff elected to and did declare the entire balance due and payable under the provisions of the Note.

9.     The above default has not been cured and the total amount due and payable through November 19, 2015 is $697,923.91.  Said arrearage is comprised of $574,053.00 in principal; plus $117,061.71 in interest to November 19, 2005; plus late charges of $110.45; plus attorney's fees and costs of $6,698.75 as provided in the Note.

10.    The amounts due are based on my review of the following records: the attached payoff statement and payment history.  The payoff statement was produced in response to this litigation and for the purpose of Plaintiff's Motion for Judgment by accessing the electronic database maintained by Plaintiff.   True and accurate copies of the payoff statement and the payment history are attached hereto and incorporated herein by reference as Exhibits D and E, respectively.

11.    The records are produced and maintained in the ordinary course of business of Johnson Bank, and the transactions contained therein are entries made at or near the time of their occurrence. The payment history shows the payments, charges and other disbursements against the loan. The entries are made on or near the transaction date or "Tran Dt" as reflected in the payment history, by employees of the bank in the ordinary course of the business of the bank. The entries were made at or near the time that the payments were received. Johnson Bank uses a computer program to generate the payment history and the payoff statement which is a commonly used program in the banking industry and approved by the United States Department of the Treasury, Office of Thrift Supervision. Johnson Bank uses a computer program called Insight-IBS to automatically record and track mortgage payments. The tracking and accounting program is recognized as standard in the industry. The computer program Insight-IBS accurately records mortgage payments when properly operated. In the case at bar, to the best of my knowledge, the Insight-IBS program was properly operated and properly operating to accurately record the

Defendant's mortgage payments. When a mortgage payment is received, the following procedure is used to process and apply the payment, and to create the records I reviewed. When a payment is received by the bank before the close that day's business, either in person through a teller, by mail or electronic funds transfer, the payment is posted electronically or if made in person or by mail by a data entry clerk at the bank. The payment is applied to the account. The payments are reflected in the payment history reviewed by me and attached as an exhibit to this affidavit. The systems and procedures used by Johnson are subject to audit and are also reviewed by the Office of Thrift Supervision. The records are made in the regular course of Johnson's business. In the case at bar, the entries reflecting the Defendant's payments were made in accordance with the procedures detailed above.

12.     Based on the foregoing, there are now due and owing Plaintiff Johnson Bank, by virtue of the Note, the following amounts:

| | |
|---|---|
| Unpaid Principal | 574,053.00 |
| Accrued interest through November 19, 2015 | 117,061.71 |
| Late Charges | 110.45 |
| Attorneys Fees & Costs | $6,698.75 |
| NOTE BALANCE (As of November 19, 2015) (Per Diem: $66.84) | **$697,923.91** |

13.    In the regular performance of my job functions, I am familiar with the business records maintained by Johnson Bank.  In connection with making this affidavit, I certify that I have personally examined the attached business records marked as Exhibits D and E reflecting data and information as of November 19, 2015, and that they are true and accurate.  The Note attached to the Complaint and attached hereto is a true and correct copy of the original instrument executed by the Borrower.  I am personally responsible for overseeing the instant collection action on behalf of Plaintiff.

And further affiant sayeth not.

_____
Lydia Vela
Johnson Bank

Subscribed and Sworn to before me
this 16th day of November, 2015.

_____
Notary Public

State of Illinois
My Commission expires: Jan 10th, 2016
Personally Known √ OR Produced Identification _____.
Type of identification produced: _____.

5

# HOME EQUITY TOTAL LINE OF CREDIT AGREEMENT

| Principal $385,000.00 | Loan Date 03-06-2008 | Maturity | Loan No | Call / Coll | Account | Officer 1443 | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** DANIEL E. WALSH
NOELLE V. WALSH
1439 PLEASANT LANE
GLENVIEW, IL 60025

**Lender:** JOHNSON BANK
WHITEFISH BAY BRANCH
5500 N LAKE DRIVE
WHITEFISH BAY, WI 53217

---

## CREDIT LIMIT: $385,000.00

## DATE OF AGREEMENT: March 6, 2008

**Introduction.** This Home Equity Total Line of Credit Agreement ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through JOHNSON BANK. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean JOHNSON BANK. You agree to the following terms and conditions:

**Promise to Pay.** You promise to pay JOHNSON BANK, or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until termination of your Credit Line Account. All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon termination. The draw period of your Credit Line will begin on a date, after the Opening Date, when this Agreement is accepted by us in the State of Wisconsin, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: One year from the date of this agreement; automatically extended from year to year after this date unless the Lender gives me notice to the contrary at least 30 days prior to the annual anniversary date. You may obtain credit advances during this period ("Draw Period").

**Minimum Payment.** Your "Regular Payment" will equal the amount of your accrued FINANCE CHARGES. Your payments will be due monthly. Your "Minimum Payment" will be the Regular Payment, plus any amount due and all other charges. An increase in the ANNUAL PERCENTAGE RATE may increase the amount of your Regular Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**Balloon Payment.** Your Credit Line Account is payable in full upon termination in a single balloon payment. You must pay the entire outstanding principal, interest and any other charges then due. Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender, which may be us, willing to lend you the money. If you refinance the balloon, you may have to pay some or all of the closing costs normally associated with a new credit line account, even if you obtain refinancing from us.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to finance charges; then to any voluntary credit life and disability insurance premiums; then to unpaid principal; and then to late charges and other charges.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address on any business day will be credited to your Credit Line as of the date received.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Three Hundred Eighty-five Thousand & 00/100 Dollars ($385,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**Charges to Your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will increase the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Home Equity Check" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Credit Line to be applied to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, you acknowledge and agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.

**Overdrafts.** Writing a check on your designated checking account with us in excess of the available collected balance in the account.

**Requests By Mail.** Requesting an advance by mail.

**Requests In Person.** Requesting a credit advance in person at any of our authorized locations.

**Credit Card Access.** Using your "Passport Line of Credit Card" to receive cash advances or to make purchases.

**Internet Banking Transfers.** Requesting a credit advance from your Credit Line to be applied to your designated account by Internet Banking Transfer.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Home Equity Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Home Equity Check.

**Stolen Checks.** Your Home Equity Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Home Equity Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Home Equity Check.

**Transaction Violation.** Your Home Equity Check is less than the minimum amount required by this Agreement or you are in violation of any other transaction requirement or would be if we paid the Home Equity Check.

If we pay any Home Equity Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Home Equity Check. The Home Equity Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Home Equity Checks along with your periodic billing statements; however, your use of each Home Equity Check will be reflected on your periodic statement as a credit advance. We do not "certify" Home Equity Checks drawn on your Credit Line.

EXHIBIT
A
Blumberg No. 5119

Limitations on the Use of Credit Cards. We reserve the right not to honor Passport Line of Credit Cards in the following circumstances:

Credit Limit Violation. Your Credit Limit has been or would be exceeded by paying the Passport Line of Credit Card charge.

Stolen Credit Cards. Your Passport Line of Credit Cards have been reported lost or stolen.

Unauthorized Signatures. Your Passport Line of Credit Card is not used by an "Authorized Signer" as defined below.

Termination or Suspension. Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Credit Line charge.

Other Restriction. TRANSACTION REQUIREMENTS:

| Transaction Description: | Per Calendar Day* Limit |
|---|---|
| At a Merchant with an authorized signature | $5,000 |
| At an ATM, as a Cash Advance, with use of a PIN | $500 |
| At a Financial institution, as a Cash Advance, with an authorized signature. | $1,500 |

*Day is defined as any 24-hour calendar day.

If we pay any advance requested by use of the Passport Line of Credit Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Passport Line of Credit Card will be reflected on your periodic statement as a credit advance.

Transaction Requirements. The following transaction limitations will apply to the use of your Credit Line:

In Person Request, Credit Line Home Equity Check, Telephone Request, Overdraft and Request By Mail Limitations. The following transaction limitations will apply to your Credit Line and requesting an advance in person, the writing of Home Equity Checks, requesting an advance by telephone, writing a check in excess of your checking account balance and requesting an advance by mail.

Minimum Advance Amount. The minimum amount of any credit advance that can be made on your Credit Line is $500.00. This means any Home Equity Check must be written for at least the minimum advance amount.

Internet Banking Transfers Limitations. The following transaction limitations will apply to your Credit Line and accessing by other methods.

Minimum Advance Amount. The minimum amount of any credit advance that can be made on your Credit Line is $5.00.

Credit Card Limitations. The following transaction limitations will apply to your Credit Line and using a Credit Card.

Maximum Amount Per Period. The maximum dollar amount of advances that you may obtain per day is $5,000.00.

Limitation on All Access Devices. You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

Authorized Signers. The words "Authorized Signer" on Home Equity Checks and Passport Line of Credit Cards as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for this Credit Line Account.

Lost Home Equity Checks and Passport Line of Credit Cards. If you lose your Home Equity Checks or Passport Line of Credit Cards or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (888) 769-3796. You also can notify us at Johnson Bank 555 Main Street, Racine, WI 53403.

Liability for Unauthorized VISA Credit Card Transactions. Tell us AT ONCE if you believe your VISA credit card has been lost or stolen or of any unauthorized transactions. Your liability for unauthorized use of your credit card with the VISA logo when it is used as a VISA credit card to access this Credit Line will not exceed zero dollars ($0.00). We may require you to provide a written statement regarding claims of unauthorized VISA credit card transactions.

These provisions limiting your liability do not apply to VISA commercial credit cards, ATM transactions or PIN transactions not processed by VISA; and apply only to cards issued in the United States. With respect to unauthorized transactions, these limits may be exceeded to the extent allowed under applicable law only if we determine that you were grossly negligent or fraudulent in the handling of your account or credit card. For specific restrictions, limitations, and other details, see your Cardholder Agreement. To notify us of lost or stolen cards, or of unauthorized transactions, call us at (262) 598-1653 or write to us at Johnson Bank 555 Main Street, Racine, WI 53403. This will help prevent unauthorized access to your account and minimize any inconvenience.

VISA is a registered trademark of Visa International.

Liability for Unauthorized Use. You will not be liable for unauthorized use of your Visa access device if you notify us or our designee at JOHNSON BANK, WHITEFISH BAY BRANCH, 5600 N LAKE DRIVE, WHITEFISH BAY, WI 53217, (       ),  _____, orally or in writing, of the loss, theft, or possible unauthorized use.

If you use an access card which debits a checking account (or other consumer asset account) but also draws on an overdraft line of credit, Regulation E provisions apply, as well as sections 226.13(d) and (g) of Regulation Z. In such a transaction, you might be liable for up to $50.00 under Regulation Z. Also, you might be liable for $50.00, $500.00, or an unlimited amount under Regulation E, or a lesser amount under applicable state law. Please refer to your electronic fund transfer disclosure for liability limitations and error-resolution procedures for transactions covered by the federal Electronic Fund Transfers Act.

Future Credit Line Services. Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

Collateral. You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage dated March 5, 2008, to us on real property located in COOK County, State of Illinois.

Insurance. You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

Right of Setoff. To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account, including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts.

Periodic Statements. If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

When FINANCE CHARGES Begin to Accrue. Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed. A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid FINANCE CHARGES. This gives us the "daily balance."

Method of Determining the Amount of FINANCE CHARGE. Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic FINANCE CHARGES for each day in the billing cycle. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE. We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the highest U.S. Prime Rate as published in the Wall Street Journal "Money Rates" table on the third Wednesday (or the next banking day if Wednesday is not a banking day) of the second month

preceding each rate change date (the "Index"). We will use the most recent Index value available to us as of the date of any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute Index after notice to you. To determine the Periodic Rate that will apply to your account, we subtract a margin from the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year. (daily). This result is the ANNUAL PERCENTAGE RATE. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect on the first day of each month beginning with the third subsequent month following the date of this adjustment. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the lesser of 18.000% or the maximum rate allowed by applicable law. Today the Index is 6.000% per annum, and therefore the Initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are as stated below:

Current Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | -0.500% | 5.500% | 0.01507% |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

Conditions Under Which Other Charges May Be Imposed. You agree to pay all the other fees and charges related to your Credit Line as set forth below:

Annual Fee. A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: Annually (Waived 1st Year).

Returned Items. You may be charged $15.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

Overlimit Charge. Your Credit Line Account may be charged $60.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a Home Equity Check in excess of your available balance.

Late Charge. Your payment will be late if it is not received by us within 15 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the payment.

Other Charges. Your Credit Line Account may be charged a Recapture Fee: the lesser of 1% of the credit limit or $400, if closed within 2 years of account opening.

Lender's Rights. Under this Agreement, we have the following rights:

Termination and Acceleration. We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Line Account. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

Suspension or Reduction. In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

Change in Terms. We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original Index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

Collection Costs. We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

Access Devices. If your Credit Line is suspended or terminated, you must immediately return to us all Home Equity Checks and any other access devices. Any use of Home Equity Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Home Equity Checks or other Credit Line access devices not returned to us.

Delay in Enforcement. We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

Cancellation by you. If you cancel your right to credit advances under this Agreement, you must notify us and return all Home Equity Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

Prepayment. You may prepay all or any amount owing under the Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: JOHNSON BANK, WHITEFISH BAY BRANCH, 6600 N LAKE DRIVE, WHITEFISH BAY, WI 53217.

Notices. All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

Annual Review. You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms

provided by us. Based upon this information we will conduct an annual review of your Credit Line Account. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights (under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Johnson Bank 555 Main Street, Suite 360 Racine, WI 53403.

**Fixed Repayment Option.** Your Credit Line Account contains a feature that allows you to convert all or a portion of the outstanding balance under this Agreement to one or more fixed repayment schedules (the "Fixed Repayment Schedules"). The Fixed Repayment Schedules allow you to repay certain balances over a specified period of time. Each Fixed Rate Supplement will have a fixed rate based on the balance and the number of months you have chosen to repay that converted amount. You may have up to five separate Fixed Repayment Schedules at one time. You may convert outstanding balances to Fixed Repayment Schedules by contacting us. Following submission and approval of each request, we will provide you with any required disclosures that apply to your Fixed Repayment Schedule and an agreement that sets forth the supplemental terms of your Home Equity Line of Credit Fixed Repayment Supplement ("Fixed Repayment Supplement"). After a Fixed Repayment Schedule has been created, your monthly statement will show the amount outstanding and the monthly payment due on each Fixed Repayment Schedule. You understand that the terms of this Agreement, including those set forth below, will apply at the time each Fixed Rate Supplement. As amounts are repaid under any Fixed Repayment Schedule(s) those amounts will replenish the revolving portion of credit available under your Credit Line, unless your Agreement has been terminated or suspended.

**Terms of Fixed Repayment Schedule(s).** The terms of any Fixed Repayment Schedules are the same as those contained in this Agreement and any additional terms and conditions that may appear in the Fixed Repayment Supplement you sign at the time each Fixed Repayment Schedule is created. The following terms apply to each Fixed Repayment Schedule:

(1). The principal amount, annual interest rate and loan term of the Fixed Repayment Schedule will be shown on the Loan Supplement.

(2). The loan term will be based on the repayment period you select on the authorization request, with a minimum repayment period of 24 months and a maximum repayment period of 60 months or such other period as we may approve.

(3). The minimum amount that may be converted to a Fixed Repayment Schedule is $5,000.00.

(4). You will make payments of principal and interest in accordance with the repayment schedule disclosed on the Fixed Repayment Supplement, with your final payment to include all principal and accrued interest not yet paid.

(5). Interest will be calculated for the actual number of days principal is unpaid on the basis of a 365-day year.

(6). You may pay without penalty all or a portion of the amount owed earlier than it is due.

(7). You understand and agree that any balances outstanding on any Fixed Repayment Supplement(s) are secured by the Mortgage, Deed of Trust, or other instrument that secures this Agreement and your Credit Line.

**Governing Law.** This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of the State of Wisconsin without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of Wisconsin.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

BORROWER:

X _____      X _____
DANIEL E. WALSH                       NOELLE V. WALSH

Effective Disbursement Date: _____

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

#### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill.

Johnson Bank
555 Main Street, Suite 360
Racine, WI 53403

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, it you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

#### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement of the property or services.

CREDIT PRO Lending, Ver. 5.11.00.003 Copr. Harland Financial Solutions, Inc. 1987, 2004 All Rights Reserved. - WI cr\CFI\LPL\E79.FC 55-43250 PR-300

WHEN RECORDED MAIL TO:
Johnson Bank
Retail Lending
555 Main Street, Suite 360
Racine, WI 53403



Doc#: 0807333082 Fee: $58.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 03/13/2008 10:03 AM Pg: 1 of 12

FOR RECORDER'S USE ONLY

This Mortgage prepared by:
LAURA TIEDEMAN, RETAIL LOAN PROCESSOR
JOHNSON BANK
555 MAIN ST STE 360
RACINE, WI 53403

# MORTGAGE

**MAXIMUM LIEN.** At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $385,000.00.

THIS MORTGAGE dated March 6, 2008, is made and executed between DANIEL E. WALSH and NOELLE V. WALSH; HUSBAND AND WIFE (referred to below as "Grantor") and JOHNSON BANK, whose address is 5600 N LAKE DRIVE, WHITEFISH BAY, WI 53217 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor mortgages, warrants, and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in COOK County, State of Illinois:

See LEGAL DESCRIPTION, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

The Real Property or its address is commonly known as 1438 PLEASANT LANE, GLENVIEW, IL 60025. The Real Property tax identification number is 04-26-203-025-0000.

REVOLVING LINE OF CREDIT. This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit and shall secure not only the amount which Lender has presently advanced to Grantor under the Credit Agreement, but also any future amounts which Lender may advance to Grantor under the Credit Agreement within twenty (20) years from the date of this Mortgage to the same extent as if such future advance were made as of the date of the execution of this Mortgage. The revolving line of credit obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement and Related Documents. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such





EXHIBIT
B

balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in either the Indebtedness paragraph or this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. It is the intention of Grantor and Lender that this Mortgage secures the balance outstanding under the Credit Agreement from time to time from zero up to the Credit Limit as provided in the Credit Agreement and any intermediate balance.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS INTENDED TO AND SHALL BE VALID AND HAVE PRIORITY OVER ALL SUBSEQUENT LIENS AND ENCUMBRANCES, INCLUDING STATUTORY LIENS, EXCEPTING SOLELY TAXES AND ASSESSMENTS LEVIED ON THE REAL PROPERTY, TO THE EXTENT OF THE MAXIMUM AMOUNT SECURED HEREBY. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use,

generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized.

If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien.. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on an actual cash value basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the maximum amount of Grantor's credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the

extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

Title. Grantor warrants that (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below, or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

Defense of Title. Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

Compliance With Laws. Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

Survival of Promises. All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

Existing Lien. The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

No Modification. Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall

neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

Proceedings. If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

Application of Net Proceeds. If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

Current Taxes, Fees and Charges. Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

Taxes. The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

Subsequent Taxes. If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

Security Agreement. This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

Security Interest. Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

Addresses. The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained, (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

FURTHER ASSURANCES; ATTORNEY-IN-FACT. The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

Further Assurances. At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1)   Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2)   the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

Attorney-in-Fact. If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

FULL PERFORMANCE. If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

REINSTATEMENT OF SECURITY INTEREST. If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be; notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

EVENTS OF DEFAULT. Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

RIGHTS AND REMEDIES ON DEFAULT. Upon the occurrence of an Event of Default and at any time

thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty that Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys'

fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

NOTICES. Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Mortgage:

Amendments. What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

Caption Headings. Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

Governing Law. With respect to procedural matters related to the perfection and enforcement of Lender's rights against the Property, this Mortgage will be governed by federal law applicable to Lender and to the extent not preempted by federal law, the laws of the State of Illinois. In all other respects, this Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Wisconsin without regard to its conflicts of law provisions. However, if there ever is a question about whether any provision of this Mortgage is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction that is evidenced by the Credit Agreement and this Mortgage has been applied for, considered, approved and made, and all necessary loan documents have been accepted by Lender in the State of Wisconsin.

Joint and Several Liability. All obligations of Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

No Waiver by Lender. Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean that Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just

because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means DANIEL E. WALSH and NOELLE V. WALSH and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated March 6, 2008, with credit limit of $385,000.00 from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Credit Agreement is a variable interest rate based upon an index. The index currently is 6.000% per annum. If the index increases, the payments tied to the index, and therefore the total amount secured hereunder, will increase. Any variable interest rate tied to the index shall be calculated as of, and shall begin on, the commencement date indicated for the applicable payment stream. NOTICE: Under no circumstances shall the interest rate on this Mortgage be more than the lesser of 18.000% per annum or the maximum rate allowed by applicable law. The maturity date of the Credit Agreement is . NOTICE TO GRANTOR: **THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means DANIEL E. WALSH and NOELLE V. WALSH.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their

quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means JOHNSON BANK, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X ~~Daniel E. Walsh signature~~
DANIEL E. WALSH

X ~~Noelle V. Walsh signature~~
NOELLE V. WALSH

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Wisconsin_ )
                                          ) SS
COUNTY OF _Milwaukee_ )

On this day before me, the undersigned Notary Public, personally appeared DANIEL E. WALSH and NOELLE V. WALSH, HUSBAND AND WIFE, to me known to be the individuals described in and who executed the Mortgage, and acknowledged that they signed the Mortgage as their free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ____ day of _March_ , 20 _0?_

By _____    Residing at _Milwaukee_

Notary Public in and for the State of _Wisconsin_

My commission expires _8/30/09_

LASER PRO Lending, Ver. 5.77.00.003 Copr. Harland Financial Solutions, Inc. 1997, 2005. All Rights Reserved. - IL/WI m:\CFALN\001.FC TR 66026 PR-100



## JOHNSON
### B A N K.
Member Johnson Financial Group

RECEIVED JUL 21 2010

## Change in Terms Agreement

**Borrower:** Daniel E Walsh, Noelle V Walsh

**Principal Amount:** $612,000.00          **Effective Date:** August 25, 2010

**Account Number:** 3288160886          Lender: Ann Homstad

*Change in Terms.* This Agreement sets forth and describes several changes that are being made to the terms of the above-referenced Home Equity Line of Credit (HELOC) Agreement you maintain with Johnson Bank.

*Effective Date of Changes.* These changes will be effective on and after the Maturity Date shown above, assuming you have consented to the changes and have returned a copy of your signed consent to the bank by the date indicated.

*Continued Validity.* Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.

*Change in Terms Described*

Changes in Certain Fees and Charges. That Section of the Agreement specifying certain fees and charges relating to your account is modified and revised as follows:

Annual Fee. A nonrefundable Annual Fee of $50.00 will be charged to your Credit Line at the following time: On the annual anniversary date.

Returned Item. You may be charged $15.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits charge.

Over Limit Charge. Your Credit Line Account may be charged $50.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a Home Equity Line Check in excess of your available balance.

Late Charge. In addition to our rights upon default, your payment will be late if it is not received by us within 15 days after the (Payment Due Date) shown on your periodic statement. If your payment is late we may charge you 5.00% of the payment.

Credit Line Check Printing Charge. Your Credit Line Account may be charged a standard check printing fee, after the initial box of checks is provided.

Subordination Fee. You may pay a $250.00 subordination fee if you refinance your mortgage loan or other loans secured by the property securing your line.

Stop Payment Fee. A fee of $20.00 for placing a stop payment order on a credit line check that you wrote.

Payoff Statement Fee. To the extent permitted by applicable law you may be charged a $50.00 fee for written payoff statement.

Change in Margin. The "Margin" added to the Index rate under the Agreement is revised from -0.50% to 1.00%. Together, the Index rate added with the Margin equal the ANNUAL PERCENTAGE RATE.



EXHIBIT
C

Blumberg No. 5119

Prior to signing this Agreement, Borrower read and understood all the provisions of this Agreement. Borrower agrees to the terms of this Agreement.

## NOTICE TO BORROWER

This Notice is required by Wisconsin law. In this Notice the term "you" means the Borrower named above.
DO NOT SIGN THIS AGREEMENT IF IT CONTAINS ANY BLANK SPACES.

YOU ARE ENTITLED TO AN EXACT COPY OF ANY AGREEMENT YOU SIGN.

YOU HAVE THE RIGHT AT ANY TIME TO PAY IN ADVANCE THE UNPAID BALANCE DUE UNDER THIS AGREEMENT, AND YOU MAY BE ENTITLED TO A PARTIAL REFUND OF THE FINANCE CHARGE.

Borrower: _____     Date: _7/18/10_____

Daniel E Walsh

Borrower: _____     Date: _7/18/10_____

Noelle V Walsh

Please return a signed and dated copy of this form to Johnson Bank in the enclosed postage paid envelope.
Please retain the other copy of this form with your records.

Daniel E Walsh
▓288169886-1▓Note - Std Tlc-Int Only

---

[ Change Quote... ]

## Payoff Summary
Total payoff:            696,725.91
As of:                   11/19/2015
Total daily accrual:     66.8417877

## Payoff Detail
| | | |
|---|---|---|
| Current principal: | 574,053.00 | |
| Interest to 11/19/2015: | 117,061.71 | Daily accrual of 66.8417877 |
| Late charges: | 110.45 | |
| Fee: 01 - 97: | 658.00 | Legal Fees |
| Fee: 02 - 97: | 505.75 | Legal Fees |
| Fee: 03 - 97: | 91.25 | Legal Fees |
| Fee: 04 - 97: | 681.50 | Legal Fees |
| Fee: 05 - 97: | 1,809.50 | Legal Fees |
| Fee: 06 - 97: | 399.50 | Legal Fees |
| Fee: 07 - 97: | 693.25 | Legal Fees |
| Fee: 08 - 97: | 380.00 | Legal Fees |
| Fee: 09 - 97: | 141.00 | Legal Fees |
| Fee: 10 - 97: | 70.50 | Legal Fees |
| Fee: 11 - 97: | 70.50 | Legal Fees |
| Total payoff: | 696,725.91 | |

## Note Information
| | | | |
|---|---|---|---|
| Category: | R - Revolving credit | Transactions allowed: | C - User defined |
| TLC: | Yes | Teller activity: | 0.00 |
| Participation: | No | Quote issued: | No |
| Interest type: | S - Simple, in arrears | Loan status: | C - Completely charged off |
| Accrual basis: | 5 - Actual/365 | Interest accrual: | 115,457.5164798 |
| Earn/rebate method: | 1 - Accruing (simple interest) | Interest paid to: | 04/29/2011 |
| Collateral description: | 1438 Pleasant Ln Glenview IL 60025 | | |

WARNING: IF PAYING BALANCE TO ZERO DO NOT INCLUDE CURRENT ASSESSED FEES
WARNING-FEES WITH A COMB BILL IND NOT = R, DO NOT INCLUDE IF PAYING BAL TO ZERO

Close Message Area





EXHIBIT
E
Blumberg No. 5119

Daniel E Walsh
288169886- Note - Std Tlc-Int Only

35 items: Life-to-date beginning 03/06/2008

| Effective / Posted | Type | Amount | Principal | Interest | Balance | Part or Fee |
|---|---|---|---|---|---|---|
| 11/25/2014 11/26/2014 | 660 - Special payment | 37,947.00 | 37,947.00 | 0.00 | 574,053.00 | |
| 06/27/2011 06/27/2011 | 619 - ACH/autopayment | 2,137.80 | 0.00 | 2,137.80 | 612,000.00 | |
| 04/25/2011 04/25/2011 | 619 - ACH/autopayment | 2,066.54 | 0.00 | 2,066.54 | 612,000.00 | |
| 03/28/2011 03/28/2011 | 619 - ACH/autopayment | 2,137.80 | 0.00 | 2,137.80 | 612,000.00 | |
| 02/25/2011 02/25/2011 | 619 - ACH/autopayment | 2,209.06 | 0.00 | 2,209.06 | 612,000.00 | |
| 01/25/2011 01/25/2011 | 619 - ACH/autopayment | 2,137.80 | 0.00 | 2,137.80 | 612,000.00 | |
| 12/27/2010 12/27/2010 | 619 - ACH/autopayment | 2,209.06 | 0.00 | 2,209.06 | 612,000.00 | |
| 11/26/2010 11/26/2010 | 619 - ACH/autopayment | 2,137.80 | 0.00 | 2,137.80 | 612,000.00 | |
| 10/26/2010 10/26/2010 | 619 - ACH/autopayment | 2,334.81 | 0.00 | 2,334.81 | 612,000.00 | |
| 09/27/2010 09/27/2010 | 619 - ACH/autopayment | 1,429.39 | 0.00 | 1,429.39 | 612,000.00 | |
| 08/25/2010 09/07/2010 | 400 - Rate change | 4.250000% | 0.00 | 0.00 | 612,000.00 | |
| 08/25/2010 08/25/2010 | 619 - ACH/autopayment | 1,383.28 | 0.00 | 1,383.28 | 612,000.00 | |
| 07/26/2010 07/26/2010 | 619 - ACH/autopayment | 1,429.39 | 0.00 | 1,429.39 | 612,000.00 | |
| 06/25/2010 06/25/2010 | 619 - ACH/autopayment | 1,383.28 | 0.00 | 1,383.28 | 612,000.00 | |
| 05/26/2010 05/26/2010 | 619 - ACH/autopayment | 1,429.39 | 0.00 | 1,429.39 | 612,000.00 | |
| 04/26/2010 04/26/2010 | 619 - ACH/autopayment | 1,290.42 | 0.00 | 1,290.42 | 612,000.00 | |
| 03/29/2010 03/29/2010 | 619 - ACH/autopayment | 1,207.95 | 0.00 | 1,207.95 | 612,000.00 | |
| 03/09/2010 03/09/2010 | 750 - Note increase | 77,571.96 | 77,571.96 | 0.00 | 612,000.00 | |
| 02/25/2010 02/25/2010 | 619 - ACH/autopayment | 1,248.21 | 0.00 | 1,248.21 | 534,428.04 | |
| 01/25/2010 01/25/2010 | 619 - ACH/autopayment | 826.69 | 0.00 | 826.69 | 534,428.04 | |
| 12/29/2009 12/29/2009 | 750 - Note increase | 175,045.00 | 175,045.00 | 0.00 | 534,428.04 | |
| 12/28/2009 12/28/2009 | 668 - System-generated payment | 570.38 | 570.38 | 0.00 | 359,383.04 | |
| 12/28/2009 12/28/2009 | 619 - ACH/autopayment | 0.00 | 0.00 | 0.00 | 359,953.42 | |
| 12/22/2009 12/22/2009 | 610 - Regular payment | 126.41 | 0.00 | 126.41 | 359,953.42 | |

| 12/22/2009 12/22/2009 | 610 - Regular payment | 443.97 | 0.00 | 443.97 | 359,953.42 |
|---|---|---|---|---|---|
| 11/23/2009 11/23/2009 | 750 - Note increase | 149,500.00 | 149,500.00 | 0.00 | 359,953.42 |
| 11/23/2009 11/23/2009 | 610 - Regular payment | 443.97 | 0.00 | 443.97 | 210,453.42 |
| 10/02/2009 10/02/2009 | 750 - Note increase | 210,453.42 | 210,453.42 | 0.00 | 210,453.42 |
| 12/17/2008 12/17/2008 | 400 - Rate change | 2.750000% | 0.00 | 0.00 | 0.00 |
| 10/31/2008 10/31/2008 | 400 - Rate change | 3.500000% | 0.00 | 0.00 | 0.00 |
| 10/08/2008 10/09/2008 | 400 - Rate change | 4.000000% | 0.00 | 0.00 | 0.00 |
| 08/25/2008 09/04/2008 | 400 - Rate change | 4.500000% | 0.00 | 0.00 | 0.00 |
| 07/01/2008 07/01/2008 | 400 - Rate change | 4.500000% | 0.00 | 0.00 | 0.00 |
| 06/01/2008 05/30/2008 | 400 - Rate change | 4.750000% | 0.00 | 0.00 | 0.00 |
| 03/06/2008 03/14/2008 | 310 - New note | 0.00 | 0.00 | 0.00 | 0.00 |